UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SPORTBOX LLC, and<br>WILLIAM V. FRABIZIO III<br><br>       Plaintiffs,<br><br>v.<br><br>ELECTRIC-SPORTS, INC.,<br>JOHN E. CONWAY, and MARK BORTMAN<br><br>       Defendants. | CIVIL ACTION No. 04-12588 DPW |
| ELECTRIC SPORTS, INC.,<br>JOHN E. CONWAY, and MARK BORTMAN<br><br><br>       Plaintiffs in Counterclaim,<br><br><br>v.<br><br>SPORTBOX LLC, and<br>WILLIAM V. FRABIZIO III,<br><br><br>       Defendants in Counterclaim. | |

**DEFENDANTS' EMERGENCY MOTION FOR ORDER
IMPOUNDING CERTAIN EXHIBITS TO
WILLIAM V. FRABIZIO III'S MOTION TO
<u>AMEND THE COMPLAINT</u>**

Plaintiff William V. Frabizio III ("Frabizio") has filed papers in the Court's public record

which contain Defendants' sensitive, confidential and privileged materials. Defendants Electric

Sports, Inc. ("Electric Sports"), John E. Conway ("Conway") and Mark Bortman ("Bortman")

(collectively, "Defendants") respectfully move this Court pursuant to Local Rule 7.2 to issue an

order impounding Exhibits 16, 18 and 20 of Frabizio's Motion to Amend the Complaint With

Exhibits And Provide A Settlement Agreement That Supersedes And Negates Defendants'

Counterclaims ("Motion to Amend") (Court Docket No. 18) and Frabizio's Second Amended Complaint (Court Docket No. 16) in the form attached hereto as *Exhibit A*.

As grounds therefore, Defendants state as follows:

1.      This Motion is presented for the Court's expedited review because the public dissemination of the Defendants' confidential and privileged materials through the Court's public file may severely damage the Defendants if action is not taken immediately.

2.      On or around March 3, 2005, Frabizio filed the instant Motion to Amend and Second Amended Complaint. On March 10, 2005, the Court Clerk entered Frabizio's Motion to Amend and Second Amended Complaint as well as the attached exhibits in the public docket.

3.      Frabizio attached as exhibits to the Motion to Amend and Second Amended Complaint confidential and proprietary documents that are the Defendants' property and contain highly sensitive trade secrets and proprietary business information.

4.      Exhibit 16 to the Motion to Amend and Second Amended Complaint is one version of Electric Sports' business plan that was developed by Bortman and Conway in August and September 2004 and misappropriated and disseminated by Frabizio and Sportbox as described in the Defendants' Verified Counterclaims. *See* Answer and Verified Counterclaims (Court Docket No. 7) ¶¶ 34-40. This business plan contains Electric Sports' sales and marketing strategy as well as financial information and sales goals that are proprietary to Electric Sports and treated as confidential business information. *See id.*

5.      Exhibit 18 to the Motion to Amend and Second Amended Complaint purports to excerpt material from an attorney-client privileged email sent from current counsel to Bortman on September 13, 2004. Frabizio and Sportbox obtained access to this privileged communication without permission and, while represented by counsel, certified that they had destroyed the

communication, which would include all of the excerpts found in Exhibit 18.  *See Exhibit B* at ¶ 8.  This communication is privileged and confidential and should not be disclosed to the public.

6.      Exhibit 20 to the Motion to Amend and Second Amended Complaint contains a settlement agreement dated November 10, 2004 between Conway and Sportbox, that provides, among other things, that Conway and Sportbox "agree to keep the terms of this Agreement, including the Settlement Amount, completely confidential."  *See* Motion to Amend (Court Docket No. 18), Exhibit 20 at ¶ 5.  Even if, as Frabizio alleges in his Motion and Second Amended Complaint, provisions of this Exhibit are relevant to the case at bar, there is no reason to disclose all of the sensitive and confidential details of Conway's and Sportbox's settlement agreement to the public.

7.      Publication of these Exhibits in the Court's docket is likely to damage Defendants' business and reputation by publicly disseminating Defendants' trade secrets and confidential business information, the contents of privileged communications and details of a confidential settlement agreement.

8.      Defendants are preparing a response to Frabizio's Motion to Amend and Second Amended Complaint that shall be filed with the Court shortly.

9.      Impoundment of these exhibits for a limited period of time, until the Court has acted upon the Plaintiff's Motion to Amend and Defendants' response, shall impose no burden on any party or non-party.

10.    Under these circumstances, there is good cause to issue an order impounding Exhibits 16, 18 and 20 to Frabizio's Motion to Amend the Complaint With Exhibits And Provide A Settlement Agreement That Supersedes And Negates Defendants' Counterclaims (Court Docket No. 18) and Second Amended Complaint (Court Docket No. 16) in the form attached hereto as *Exhibit A*.

Respectfully submitted,

ELECTRIC SPORTS, INC.,
MARK BORTMAN and JOHN E. CONWAY,

By their attorneys,


**/s/ Gabriel M. Helmer**
Michele A. Whitham  (BBO No. 553705)
Gabriel M. Helmer (BBO No. 652640)
FOLEY HOAG LLP
155 Seaport Blvd.
Boston, MA  02210
(617) 832-1000

ATTORNEYS FOR DEFENDANTS

Dated: March 14, 2005


## LOCAL RULE 7.1 CERTIFICATION

The undersigned counsel for the plaintiffs hereby certifies that counsel for defendants attempted in good faith to confer on this motion with plaintiffs SPORTBOX, LLC and WILLIAM V. FRABIZIO III by telephone on March 14, 2005, but was unable to resolve this issue.


**/s/ Gabriel M. Helmer**
Gabriel M. Helmer

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of March, 2005, I caused a true copy of the above document to be served upon SPORTBOX, LLC and WILLIAM V. FRABIZIO III by mail.


**/s/ Gabriel M. Helmer**
Gabriel M. Helmer

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SPORTBOX LLC, and
WILLIAM V. FRABIZIO III

    Plaintiffs,

v.

ELECTRIC-SPORTS, INC.,
JOHN E. CONWAY, and MARK BORTMAN

    Defendants.

CIVIL ACTION No. 04-12588 DPW

ELECTRIC SPORTS, INC.,
JOHN E. CONWAY, and MARK BORTMAN

    Plaintiffs in Counterclaim,

v.

SPORTBOX LLC, and
WILLIAM V. FRABIZIO III,

    Defendants in Counterclaim.

## **[Proposed] IMPOUNDMENT ORDER**

Upon Motion by Defendants Electric Sports, Inc. ("Electric Sports"), John E. Conway ("Conway") and Mark Bortman ("Bortman") and pursuant to Local Rule 7.2, sufficient grounds existing to protect confidential and proprietary information, communications, and documents filed with this Court,

IT IS HEREBY ORDERED THAT:

1.   Exhibits 16, 18 and 20 (collectively "Exhibits") to Plaintiff William V. Frabizio's Motion to Amend the Complaint With Exhibits And Provide A Settlement Agreement That Supersedes And Negates Defendants' Counterclaims ("Motion to Amend") (Court Docket No.

18) and Second Amended Complaint (Court Docket No. 16) shall be impounded until thirty (30) calendar days from the entry of this Court's order upon Plaintiff's Motion to Amend.

2.    After the expiration of this thirty (30) calendar day period, the clerk shall place all Exhibits in the public file if this Court has not set an alternative procedure for their disposal by further order and notice to the Parties and the Clerk.

DATED: _____    _____
                                   United States District Judge

# TAYLOR, GANSON & PERRIN, L.L.P.

COUNSELLORS AT LAW

VARNUM TAYLOR (1909 - 1979)
CHARLES MACKAY GANSON (1908 - 1982)
WM. GARDNER PERRIN (1909 - 2001)
BRADLEY RIDGWAY COOK
CHARLES F. O'CONNELL
JOHN A. LEITH
JOHN P. FULGINITI
MARTHA CARROLL CASEY
PAUL F. DONOVAN
DAVID P. HUTCHINSON
JOSEPH G. IMBRIANI
EDWARD R. MARTIN

MAUREEN B. CARNEY
RYAN A. BOLAND**
THALIA H. SUGARMAN
SERGE O. BECHADE
HEATHER J. LANGE***
ELISABETH A. HOLMES
ALISA L. HACKER
JENNIFER N. SHEA

OF COUNSEL:
  JAMES D. COLT
  WILLIAM F. KEHOE

 *ALSO ADMITTED IN NEW HAMPSHIRE
 **ALSO ADMITTED IN NEW YORK
***ALSO ADMITTED IN PENNSYLVANIA

THE LANDMARK
160 FEDERAL STREET
TWENTIETH FLOOR
BOSTON, MASSACHUSETTS 02110

TELEPHONE: 617 951 - 2777
FACSIMILE: 617 951 - 0989

BEVERLY FARMS, MASSACHUSETTS

TELEPHONE: 978 921 - 7330

October 5, 2004

**BY FACSIMILE (617) 832-7000**
**AND FIRST CLASS MAIL**

Michele A. Whitham, Esq.
Foley Hoag, LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02210-2600

Re:   Mark Bortman – Sportbox, LLC

Dear Michele:

I am in receipt of your letter dated September 27, 2004 regarding Mark Bortman's various claims against my client, Sportbox, LLC. I have had an opportunity to review each of the claims with my client and to gather additional facts relevant to Mr. Bortman's assertions. Please find my client's responses below as I understand the facts from them, corresponding roughly to the sequence of your letter.

1.    **Accrued, Unused Vacation Pay**. In our telephone conversation of September 15th, I acknowledged only that Sportbox was obligated to pay Mr. Bortman any accrued but unused vacation pay. I did not confirm or acknowledge any specific amount or accumulated time, and certainly not the amount set forth in your letter, as discussed below.

In my email to you of September 16th, I set forth my client's calculation of Mr. Bortman's accrued but unused vacation pay. My client confirmed the calculation in my email to you but also reminded me that Sportbox was entitled and obligated to withhold appropriate amounts for taxes, which it did. For your convenience, I have attached an

# TAYLOR, GANSON & PERRIN, L.L.P.

exhibit setting forth this calculation. But for the appropriate deduction of the applicable tax, I provided you with a detailed calculation supporting my client's position in my email, contrary to the assertion in your letter. Accordingly, my client believes the amount transferred to your account on behalf of Mr. Bortman, $2,231.45, is the total amount due.

You assert that Mr. Bortman is entitled to two weeks of vacation pay. As shown on the attached exhibit, this is not accurate. In addition, we cannot even determine the basis on which you and Mr. Bortman equate two weeks vacation pay to $5,183.50. As I am sure you are aware, Mr. Bortman's base annualized salary is $95,000. Please see the enclosed copy of Mr. Bortman's offer letter (and as I understand it the only agreement with respect to compensation and benefits). By any calculation the amount you assert would impute to an annualized salary for Mr. Bortman of between $125,000 and $135,000. Frankly I was expecting a more detailed accounting of Mr. Bortman's demands, including this claim, particularly in light of your erroneous assertion that Sportbox had not provided a detailed accounting. Kindly provide your supporting calculation for the amount demanded and how it differs from the calculation of Sportbox.

As you will see in the attached offer letter, no commitments were made by Sportbox as to paid vacation. However, in practice the company accrued vacation at the generous annualized rate of 4.5 weeks per year. The only days that the company deducted as used vacation were Friday, August 13, on which Mr. Bortman attended a golf outing with his child (as indicated in his calendar and conforming to the recollection of Mr. Frabizio and Ms. Mariani) and Monday, August 17 (as discussed below in the next section). The company's assessment that Mr. Bortman used only two days of vacation during his five month tenure with the company is also generous.

With respect to the timing of the payment, Mr. Bortman was notified in person that his accrued vacation pay would be mailed out at the end of the applicable payroll cycle. He readily agreed and Sportbox sent the check for $2,231.45, certified mail, to Mr. Bortman's home address on August 27 (the date of the agreed payroll period). When I informed my client of our conversation on September 15 in which you challenged me that this payment had been made, my client was surprised that Mr. Bortman had not received the check and inquired at the U.S. Postal Service. At that time the U.S. Postal Service informed my client that the correspondence was lost, of which I notified you with details immediately thereafter. At your request, my client transferred the amount due to Mr. Bortman for accrued vacation, less applicable taxes, directly into the account you designated. Subsequently we have determined that the U.S. Postal Service attempted on at least three different occasions to deliver the letter containing the check. As we understand it, this is an abnormal result and it is not clear why the USPS could not deliver the letter to your client. Any suggestion that Sportbox withheld or delayed the payment is unfair and inappropriate. I have attached a copy of the envelope, check and paystub for your reference.

2.    **Unpaid Wages**. Let me first correct the dates you assert in your letter. You reference August 23 and 24 as the two days of work he performed immediately prior to his resignation. As shown on the enclosed copy of Mr. Bortman's resignation letter, he resigned formally on August 17. Presumably these are just typos and the days to which you intend to refer are Monday, August 16 and Tuesday, August 17.

2

# TAYLOR, GANSON & PERRIN, L.L.P.

Obviously if Mr. Bortman was conducting these activities on the actual dates that you cite and subsequent to his resignation, that would present separate issues and would raise concerns about interference with Sportbox's commercial relationships.

Assuming the activities asserted relate to Monday, August 16 and Tuesday, August 17, my client's recollection of events on each of those days are as set forth below.

### Monday, August 16

Mr. Bortman arrived at the office mid morning. It does not appear that he performed any company related work in the morning. His outbound email traffic was limited. At approximately noon of that day, he informed Mr. Frabizio of his interest and intention to take some time off to recharge himself and come back with more energy. Promptly thereafter, Mr. Bortman left the office. Later in the day, Mr. Frabizio and Ms. Mariani made a call to Mr. Bortman on his cellphone, in which call Mr. Bortman announced his intention to resign from the company. Mr. Frabizio and Ms. Mariani expressed disappointment and suggested Mr. Bortman think about the decision and offered some alternatives, such as a leave of absence.

Mr. Bortman did not indicate during the call that he was in transit to the Patriots on behalf of the company, nor did he mention it earlier to Mr. Frabizio or Ms. Mariani. His calendar does not indicate any appointment with the Patriots, nor does Jack Mula of the Patriots recall a follow up meeting with Mr. Bortman (although he does recall Mr. Bortman calling him after his resignation to tell him so and that Mr. Bortman would be back in touch with Mr. Mula). Accordingly, the company has concluded that Mr. Bortman did not perform any work for the company on that day and has applied a vacation day to Mr. Bortman.

Specifically with respect to the Patriots, Sportbox did not, and does not currently, have an agreement in place with the Patriots. The Patriots had provided a proposal which was well beyond the company's interest level. Mr. Frabizio determined, and communicated to Mr. Bortman via email, that this proposal was not favorable to the company. Mr. Bortman's further efforts for the company, if any, with respect to the Patriots therefore were not sanctioned by or for the benefit of the company. It is also curious that Mr. Bortman, on the day of his announcement of his resignation, would make a long trip to meet with the Patriots to address this problematic proposal.

We note with interest the email inquiry to Sportbox from James L. Montgomery of your firm on August 26, 2004 regarding Sportbox's product availability for NFL games. It is not common in the company's experience to receive initial business inquiries from attorneys (particularly from the same firm representing a former employee).

### Tuesday, August 17

Mr. Frabizio and Ms. Mariani specifically recall that Mr. Bortman came into the office mid to late morning on Tuesday, August 17. At that time Mr. Frabizio recalls that Mr. Bortman presented his written resignation, remained at the office for approximately

3

# TAYLOR, GANSON & PERRIN, L.L.P.

15 minutes, not tending to any company business, and then left. There is no indication of any outbound email activity from Mr. Bortman's company account on that day. Accordingly, the company has concluded that Mr. Bortman did not perform any work for the company on that day and no wages are due.

My client is dubious of Mr. Bortman's assertion that he spent a substantial portion of his last days working with customers for the benefit of the company, particularly in light of his sudden resignation, his affiliation with Mr. Conway and apparent efforts to begin a competing venture.

In order to avoid the possibility that Sportbox does not have all of the facts with respect to the two days in question, kindly have Mr. Bortman provide the names of the customers with which he interacted in his last few days. Sportbox can then verify the occurrence and content of Mr. Bortman's interactions with such customers.

At present and without further corroboration, therefore, Sportbox disagrees that Mr. Bortman actually performed services for Sportbox on the days in question and accordingly no wages are due.

Assuming further that Mr. Bortman's activities were to be corroborated and in fact were in support and for the benefit of Sportbox, there is no support for the amount demanded, $518.35. This amount is not consistent with his wage rate, nor is it even consistent with your calculation of Mr. Bortman's wage rate for accrued vacation, which I would expect would be 20% (2 days of 10) of the two week request.

3.    **Additional Amounts – Sick and Personal Days**.  Mr. Bortman's understanding of the additional accrual of ten days of sick and personal time is incorrect. Sportbox does not have any written or de facto policy regarding personal time.  Any personal time would be incorporated within the 4.5 weeks of annualized vacation and personal time provided.

With respect to sick time, my client operates under a "use it or lose it" policy which was communicated to Mr. Bortman.  Sick time does not constitute wages due under the referenced statutes. The company's generosity of accruing substantial sick time for the contingent benefit of Mr. Bortman over and above the annualized accrual of 4.5 weeks of vacation should not be the basis of an overreaching claim.

4.    **Unpaid Earned Commissions**.  Enclosed please find a copy of Mr. Bortman's offer letter.  As I understand it from my client, this letter represents the entirety of any agreement between the parties with respect to Mr. Bortman's commission structure.  You had requested a copy of this (please note this document was included in his personnel file a full copy of which was provided to Mr. Bortman upon his request of August 17).

Before responding to each of the specific claims, I wanted to highlight that Mr. Bortman is only entitled to commissions on "gross sales generated".  My client's intent at all times was and remains to pay commissions to Mr. Bortman on sales actually made – radios sold and payment collected pursuant to Mr. Bortman's meaningful efforts. The purpose of the commission structure was to incentivize Mr. Bortman to develop new

# TAYLOR, GANSON & PERRIN, L.L.P.

sales relationships for Sportbox that were profitable and priced in accordance with the company's sales policy guidelines and stated business model, which guidelines were communicated by my client to Mr. Bortman.

a. LA Dodgers – Mr. Bortman did not have any meaningful participation in this sale and accordingly is not entitled to a commission. Prior to his employment with Sportbox, Major League Baseball introduced the contact at the LA Dodgers to Mr. Frabizio. Mr. Frabizio had conversations and negotiations with the buyer for the Dodgers and initiated and presented artwork to the Dodgers. Subsequently Mr. Bortman joined the company and Mr. Frabizio asked Mr. Bortman to complete the sale by taking the order from the Dodgers, which he did.

b. Cincinnati Reds – The terms Mr. Bortman negotiated with the Reds, which effectively permitted the Reds to purchase radios on consignment and pay if, and as, they were sold, or return them to Sportbox at no cost to them, were contrary to the company's policy and business model. No sales are generated until the company would be entitled under GAAP to recognize revenue on the transaction. To date, the company has only received approximately $5,000 (net of shipping costs and taxes) from the Reds, which does not yet cover the amount due to the manufacturer for the full order of radios initiated by Mr. Bortman. Accordingly, the company is carrying a loss on this transaction due to this abnormal arrangement. If and to the extent Sportbox ever collects on the full amount of this order, it is willing to pay Mr. Bortman the applicable commission.

c. Yankee Pro Shops – No sale was actually made. The customer cancelled the order. Accordingly no commission is due.

d. Center Plate / Yankee Stadium – Sportbox agrees that Mr. Bortman is entitled to the commission on this sale.

e. GM - No sale was actually made. The customer cancelled the order after reviewing preliminary artwork. Accordingly no commission is due. In any event, Mr. Bortman negotiated an arrangement by which Sportbox would sell these radios at a loss and clearly outside of the company's sales policy.

f. Cumberland Farms – No sale was actually made. The customer cancelled the order (and notified Mr. Bortman, as my client understands it from the Cumberland Farms representative). Accordingly no commission is due.

g. Host Marriott St. Louis – No purchase order was ever submitted and thus no sale occurred. Accordingly no commission is due.

5.    **Unpaid Business Expenses**.

a. *Mileage Expense*. The demand in your letter is the first time that my client has become aware of this claim. You did not mention it to me in any telephone or email exchange either. Accordingly, your assertion that my client has refused to reimburse Mr. Bortman for mileage incurred on behalf of the company is incorrect. Mr. Bortman has

# TAYLOR, GANSON & PERRIN, L.L.P.

never requested, and therefore nor has the company paid, any mileage reimbursement to date.

Subject to the next paragraph, my client is willing, despite the absence of any policy or specific obligation to do so, to consider reimbursing Mr. Bortman for appropriate mileage expenses. Kindly have Mr. Bortman provide a log showing the appointments and travel comprising the mileage requested for my client's review. After reviewing the submitted log with its accountant, my client will promptly reimburse Mr. Bortman for all mileage for company business. The log will also support the company's tax deduction records.

My client believes that it has reimbursed Mr. Bortman for gas. As you know, Mr. Bortman would not be entitled to both gas reimbursement and mileage reimbursement, as they address the same business expense. Were the company to claim both expenses as deductions on its income tax return, such position might well be considered tax fraud. Accordingly, any mileage reimbursement to Mr. Bortman would be reduced by amounts reimbursed for gas for the same travel.

b. *Office Supplies*. My client is relieved to see the office supply claim reduce from the initial assertion of $6,000 to the lower amount presented in your letter. In our phone conversation on September 15, you committed to providing an accounting of the requested reimbursement, but your letter does not reflect any support. I had suggested, in lieu of the receipts, to provide applicable excerpts from Mr. Bortman's credit card statements of the purchases on behalf of the company, to which you appeared to agree, but to date have not supplied.

My client made a diligent search of Mr. Bortman's office after his departure and did not find any receipts. Accordingly we cannot comply with your request to provide the receipts. I also want to convey my client's surprise that Mr. Bortman would resign after some deliberation without taking care to collect receipts aggregating over $1,000 for which he believes he is entitled to reimbursement.

I note that my client asked Mr. Bortman to provide all receipts for which he needed reimbursement to which he responded by submitting various receipts, all of which were promptly reimbursed (without a detailed review of such receipts, some of which appear to be for personal items rather than for company supplies and materials). Mr. Bortman confirmed in an email to my client, after direct inquiry, that he had submitted all receipts for which he needed reimbursement. This is why your assertion by phone on September 15 and your demand in the letter come as surprises to my client. My client has also noted the very close similarity of the amount already reimbursed for receipts submitted with the additionally claimed amount, for which receipts appear to be missing, and wanted to confirm that these do not overlap.

To the extent Mr. Bortman expended funds on the company's behalf, the company is certainly willing to reimburse him for such amounts. Given the missing receipts, however, I renew my request for Mr. Bortman to provide his credit card statements and perhaps copies of the receipts from the credit card company so that the

6

# TAYLOR, GANSON & PERRIN, L.L.P.

company may pinpoint the purchases and review them, which it will do promptly upon receipt of such supporting documentation.

6.   **Voicemail and Email**. Immediately after our conversation on September 15 in which you made me aware of this issue, I contacted my client and requested that they take action to shut off Mr. Bortman's email and voicemail. My client informs me that the email account was shut off that same day. Upon my receipt of your letter and prior to my transmission of the letter to my client, I personally tested Mr. Bortman's email account and received an undeliverable return message. Accordingly, I believe this was addressed weeks ago and should no longer be an issue.

With respect to the voice line, my client informs me that the receiving message was updated within a few days after Mr. Bortman's departure, informing the caller that they have reached Sportbox. Mr. Bortman's name was not and is not mentioned. The company is not under an affirmative obligation to inform a caller of the current status of Mr. Bortman's relationship with the company. Accordingly, it is not clear how Mr. Bortman's name was misappropriated at any time.

The company has not represented and is not representing that Mr. Bortman is still with the company. Any implication or inference by a third party to the contrary is unfortunate but not intentional. It is informative to my client that Mr. Bortman is still in contact with various commercial parties with whom he conducted business on behalf of the company.

7.   **Defamatory Comments**. Mr. Frabizio and Ms. Mariani do not recall making any defamatory comments regarding Mr. Bortman to any parties whatsoever. Without more specificity, it is difficult for my client to ascertain to what Mr. Bortman may be referring. As I mentioned to you, my client was led to believe, up until my first phone conversation with you, that the company's relationship with Mr. Bortman was nothing but congenial and indeed might have resumed in the future. As a consequence, it would not make much sense to disparage Mr. Bortman.

They are surprised, however, by the vigor and breadth of Mr. Bortman's claims, but have not commented publicly at any time.

Mr. Frabizio and Ms. Mariani have no intention of commencing any defamatory conduct and accordingly can easily comply with your request.

8.   **Inadvertent Email Disclosure**. Without having spent much time looking into the matter, I am not necessarily in agreement with your assertions regarding the applicability and results of the doctrine of inadvertent disclosure in this matter, even if the material is privileged. As I am sure you are aware, there exists a spectrum of case law in this area, which examines the applicable facts including precautions taken, the awareness of the disclosure by the disclosing party and the scope of the disclosure. As to whether the material was privileged, you told me in our phone conversation in response to my question that you were not representing Mr. Conway. You reference a Joint Defense Agreement in your letter. Presumably that was entered into prior to our conversation (otherwise the transmission most certainly could not be privileged).

7

# TAYLOR, GANSON & PERRIN, L.L.P.

Nevertheless, it was out of professional courtesy that I affirmatively informed you of the email so that no further transmissions would occur. Without conceding any conclusions on this matter, whether factual or legal, out of continuing professional courtesy we have deleted all instances of the email in question on our system and I have a confirmation from my client that they have done the same.

9. **Competing Venture**. As I mentioned in our prior telephone conversations, it is my hope and presumption that Mr. Bortman is not planning to engage, and has not engaged, in commercial activity in violation of his continuing obligations to Sportbox. The reference in your letter to a venture with Mr. Conway, as well as solicitations your firm has made to the general business community with respect to and on behalf of such venture, are disturbing to say the least. My client reserves all of its rights and remedies with respect to any such behavior in violation of its rights.

We also note Mr. Bortman's communications with you and your firm in July concerning your firm's representation of the company, none of which was sanctioned by or made known to Mr. Frabizio. Please advise on the reasons and outcome of those discussions.

I remain concerned that you may be laboring under incorrect facts. As I suggested in our phone conversation of September 15 and again above, upon Mr. Bortman's production of satisfactory supporting materials for the various substantive claims, Sportbox stands ready, able and willing to make any payments properly due to Mr. Bortman.

I look forward to your response and resolving this matter promptly to the mutual satisfaction of our clients.

Sincerely,

David P. Hutchinson

DPH/rec
cc: Willliam V. Frabizio III

8